**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

RESULT MARKETING GROUP, LTD.,

                Plaintiff,

    v.

SOUTHEASTERN GROCERS, LLC,
BI-LO, LLC, WINN-DIXIE STORES, INC.,
QUOTIENT TECHNOLOGY, INC., and
John Does 1-10,

           Defendants

Civil Action No. _____

**COMPLAINT**

Plaintiff Result Marketing Group, Ltd. ("RMG" or "Plaintiff"), by its undersigned attorneys, for its complaint against Defendants Southeastern Grocers, LLC, Bi-Lo, LLC, Winn-Dixie Stores, Inc. (collectively, the "SEG Defendants"), Quotient Technology, Inc. and John Does 1-10 (collectively, along with the SEG Defendants, "Defendants"), state as follows:

## NATURE OF THE ACTION

1.     This action arises from the SEG Defendants' brazen breach of a non-disclosure agreement and unlawful misappropriation of RMG's valuable business concept of a "Retail Media Hub," which enables a retailer like SEG to monetize its "Retail Media Estate," as well as RMG's entire playbook of proprietary and confidential trade secrets and other intellectual property for the design and implementation of a Retail Media Hub.

2.     Based upon the prospect of a lucrative commercial relationship—which the parties expected to be worth no less than $59,150,000 to RMG in the first five years alone—the SEG Defendants lured RMG into sharing its concept for a Retail Media Hub and into showing the SEG Defendants, in granular detail, how to develop and implement a Retail Media Hub. RMG agreed

1

to disclose its hard-earned and carefully protected intellectual property to the SEG Defendants only after receiving their express written commitment in the NDA not to use it or to disclose it to any third party.

3.      In breach of that promise, instead of working with RMG, the SEG Defendants secretly disclosed RMG's valuable business concept and intellectual property to Defendant Quotient. Using RMG's trade secrets and confidential information, the SEG Defendants and Quotient then together developed an essentially identical "SEG Media Hub," without licensing the right to do so and without paying RMG an appropriate fee.

4.      On March 18, 2018, the SEG Defendants brushed off RMG, falsely representing that they were not interested in developing a Retail Media Hub, stating "I don't think anyone has an appetite right now for the change it would take to flip our current model." However, only a few months later, on July 2, 2018, RMG discovered that the SEG Defendants and Quotient had gone live with the infringing SEG Media Hub, indicating that their work had begun many months earlier. Contradicting SEG's statements to RMG on March 18, 2018, in their joint press release with Quotient introducing the SEG Media Hub, the SEG Defendants stated that "[i]t's a priority for us to improve our digital shopper engagement tools with SEG Media Hub at the center of it."

5.      Thereafter, without acknowledging RMG and paying it an appropriate licensing fee, Quotient proceeded to develop an entirely new infringing line of business—which it terms "Retail Performance Media" (almost identical to RMG's term "Retail Media")—developing substantially similar Retail Media Hub platforms for a number of further retail partners, including Advantage Media, Ahold Delhaize USA, Albertsons, Dollar General, Giant Eagle, Peapod and Rite Aid.

6.     According to Quotient's public disclosures, Retail Performance Media accounts for a substantial portion of Quotient's business. The term "Retail Performance Media," and an apparent predecessor term, "Quotient Media Exchange," first appeared in Quotient's public disclosures in early 2017, indicating that Quotient and the SEG Defendants were underway in the development of the SEG Media Hub much earlier.

7.     RMG now brings this action against Defendants for breach of the NDA, misappropriation of its trade secrets and other confidential information under the United States Trade Secret Act ("USTSA") and Florida law, as well as for civil theft, under Fla. Stat. § 772.11, for tortious interference and for unjust enrichment, to vindicate RMG's rights in its valuable trade secrets and intellectual property—including RMG's right to treble damages of up to $177 million under Fla. Stat. § 772.11—as well as for an award of RMG's attorneys' fees and costs.

## PARTIES

8.     RMG is a corporation organized under the laws of the U.K. Channel Island of Jersey and with its principal place of business at 3 Jubilee Promenade, La Route de Port Elizabeth, St. Helier, Jersey JE2 3NW.

9.     Southeastern Grocers, LLC is a limited liability company organized under the laws of the State of Delaware with its principal place of business at 8928 Prominence Parkway, #200, Jacksonville, FL 32256.

10.     Defendant Bi-Lo, LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business at 8928 Prominence Parkway, #200, Jacksonville, FL 32256.

11.     Defendant Winn-Dixie Stores, Inc is a corporation organized under the laws of the State of Delaware, with its principal place of business at 8928 Prominence Parkway, #200, Jacksonville, FL 32256.

12.     Defendant Quotient Technology, Inc. is a Delaware corporation with its principal place of business at 400 Logue Avenue, Mountain View, CA 94043.

13.     John Does 1-10 are one or more subsidiaries or affiliates of the SEG Defendants and Quotient, the identities of which RMG is not aware at the time of filing, but which engaged in conduct subject to the claims of this Complaint.

## JURSDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a)(2) because (a) Plaintiff is citizen of a foreign state; (b) Defendants are citizens of a State; and (c) the amount in controversy exceeds $75,000.

15.     This Court also has subject matter jurisdiction under 28 U.S.C. §1331 because, among other things, Plaintiff brings claims herein under the Defense of Trade Secrets Act, 18 U.S.C. §1836 (2021).

16.     This Court has personal jurisdiction over the SEG Defendants because the SEG Defendants maintain their principal offices in this District. This Court has personal jurisdiction over Quotient because it is engaged in continuous and systematic business in this District, including substantial conduct giving rise to Plaintiff's claims in this Complaint.

## FACTUAL ALLEGATIONS

### A.  RMG's Proprietary Business Concept for Retail Media

17.     RMG is an independent retail media marketing agency that developed a novel and proprietary business concept for "Retail Media"—the exploitation by a retailer of its entire "Media

4

Estate," consisting of its many actual and potential channels of communication with customers. RMG also developed sophisticated tools and methods to help transform a retail business, such as a supermarket chain, into a profitable Retail Media operator, earning substantial incremental income by developing its communication channels to their full potential and exploiting the company's untapped Media Estate.

18.     The core of RMG's omni-channel Retail Media concept is a client-centered and branded "Media Hub," a centralized interface between the retailer and each of the participants in its new Retail Media business, which allows participants to explore and purchase advertising and marketing opportunities in a variety of forms and locations throughout the retailer's business.

19.     For example, a supermarket chain could make available opportunities to place advertising or marketing content in or on: (1) the retailer's printed circulars and advertisements; (2) in store posters, banners, "shelf talks," "shelf takes" and other printed material; (3) shopping cart noses; (4) in-store audio recordings; (5) the retailer's website; (6) the retailer's digital marketing, including email and social media; and (7) the retailer's television marketing.

20.     Among other things, the central interface of the Media Hub (a) allows the retailer to create campaigns to promote the sale of media; (b) allows the retailer to set and optimize prices for the purchase of advertising in the various channels of media; (c) provides media buyers with a means of submitting content, using consistent templates, for seamless operation; and (d) enables the retailer to generate performance reports that can be sold to media buyers, stimulating further media purchases.

21.     RMG pioneered these proprietary methods and tools in Europe and Australia, working with retailers including Woolworths Stores and Morrisons Supermarkets. After

successfully proving its proprietary business concept in those markets, RMG sought to bring its business model and knowhow to the United States, where the Media Hub concept was not known.

### B. RMG's Confidential and Proprietary Trade Secrets

22.     As set forth in a document, dated October 18, 2015, entitled "The Result Way of Working," RMG takes care to protect its proprietary tools and methods for "the valuation, commercialisation and development of communication channels, campaigns and sponsorships," which it developed over a period of sixteen years at substantial expense, as trade secrets of RMG.

23.     As stated in the Result Way of Working "[t]his method of doing business is one of RMG's key assets and a major contribution it provides to its customers. This method of doing business has been developed over many years and is based on RMG's considerable expertise and industry experience. All intellectual property rights in and to this document and its contents are owned, at all times, by RMG. By sharing this document with the retailer, RMG is confirming and clarifying those materials and processes over which RMG retains all rights (including, without limitation, intellectual property rights) and over which the retailer obtains only a limited licence, pursuant to the terms of the parties' MSA."

24.     The Result Way of Working describes, among other things (a) factors used in analyzing how retailers can be transformed into retail media owners; (b) a model and intellectual property for interactions and flows of information and content between the retailer, suppliers and shoppers; (c) forms and templates for communications and interactions between the retailer and other participants in the Media Hub; (d) proprietary software implementing the Media Hub according to the model; and (e) a multi-stage process for successfully developing and launching a Media Hub.

25.     The Result Way of Working states that "RMG retains all rights, including intellectual property rights, in and to the model, including its associated processes, methodology and ways of working, remain at all times and such items and materials constitute RMG confidential information. The model and associated items and materials must not be provided or disclosed to any third party, or resold, by any retailer without RMG's express written consent, even if the retailer is operating under a licence granted by RMG or continuation agreement."

26.     RMG zealously protects the secrecy of its trade secrets, including those described in the Result Way of Working, among other things, by (a) requiring its employees to enter into confidentiality and non-competition agreements; (b) imposing strict confidentiality restrictions upon on its prospective and actual business partners; and (c) offering exit terms to allow its business partners to license the right to use RMG's intellectual property in exchange for consideration, including royalties.

27.     When RMG enters into an agreement with a client to develop and implement a Media Hub, RMG licenses the use of its trade secrets on the condition that the client enters into (a) a strict non-disclosure agreement; and (b) an agreement to compensate RMG, typically by paying a percentage share of the revenue generated by the Media Hub.

28.     Because of the commercial value and sensitivity of RMG's trade secrets, RMG requires potential clients to agree to strict terms of non-disclosure agreement as a condition even to discussing a potential engagement.

**C.  SEG Requests a Proposal from RMG**

29.     In January 2016, Sharry Crammond, the Marketing Director of SEG—who had worked with RMG while at Coles Supermarkets, in Australia—contacted Richard Burgess,

Director of RMG Australia, and expressed interest in potentially retaining RMG to design and implement a Media Hub for SEG.

30.     At that time, the Retail Media concept was not known in the United States. Crammond knew of it only as a result of her prior contact with RMG while at Coles, subject to a confidentiality agreement. SEG thus was unfamiliar with RMG's concept of a Retail Media, or a Retail Media Hub, and had no prior plans to develop one.

31.     After a series of conference calls, on February 12, 2016, Burgess sent an introductory presentation to Crammond, as well as to Brett Mauser, SEG's Senior Director Strategic Sourcing and Brooke Bowman, SEG's Manager, Strategic Sourcing.

**D.  The Non-Disclosure Agreement**

32.     On March 16, 2016, RMG and the SEG Defendants, by and through their General Counsel, M. Sandlin Grimm, executed a Mutual Non-disclosure Agreement (the "NDA"), dated as of March 1, 2016, on a form supplied by the SEG Defendants.

33.     The purpose of the NDA, a copy of which is attached hereto as **Exhibit 1**, was to allow RMG to securely and confidentially share its proprietary and confidential trade secrets, business methods and other intellectual property so that the parties could explore a collaboration identified in the NDA as "Revenue Generating Advertising Management," or the "Project." Without the protections and undertakings set forth in the NDA, RMG would not have disclosed any of its proprietary and confidential trade secrets, business methods or other intellectual property to the SEG Defendants.

34.     Section 1.1 of the NDA broadly defines "Confidential Information" to include:

> **(a) all information proprietary to either party and/or any of its affiliates, subsidiaries, or parent companies** (whether or not reduced to writing or other tangible medium of expression, and whether or not patented, patentable, capable of trade secret

protection or protected as an unpublished or published work under the United States Copyright Act of 1976, as amended); **(b) information relating to the Intellectual Property and Business Practices of either party and/or any of its affiliates, subsidiaries, or parent companies** (including, without limitation, Winn-Dixie Stores, Inc. and/or Southeastern Grocers, LLC); and **(c) comparable information** that either party may receive or has received from others who do business with it.

(Emphasis added).

35. Among the Confidential Information protected by the NDA, was all of RMG's "Intellectual Property," defined in § 1.2 to include all "information relating to research and development, inventions, discoveries, developments, improvements, methods and processes, know-how, drawings, patterns, blueprints, specifications, designs, ideas, prototypes, models, samples, molds, product briefs, product concepts, engineering and technical data, algorithms, computer programs and software, compositions, works, concepts, patents, copyrights, trademarks, trade names, trade dress, trade secrets, formulae, writings, notes and patent, trademark and copyright applications."

36. Also among the Confidential Information protected by the NDA were RMG's "Business Practices," defined in § 1.3 to include all "information relating to Intellectual Property, business plans, financial information (including, without limitation, any financial statements, projections, deal sheets, summaries, or other financial data or information), products, services, manufacturing processes and methods, test methods, equipment, packaging, costs, sources of supply, advertising and marketing plans, customer lists, sales, profits, pricing methods, personnel and business relationships."

37. Under § 2 of the NDA, the SEG Defendants agreed that they would not disclose any of RMG's Confidential Information at "any time . . . to any person" or "use it for [their] own benefit or the benefit of any third party . . . without the prior written consent" of RMG. Section 2

of the NDA further committed the SEG Defendants to "maintain at least the same degree of diligence in the protection of [RMG's] Confidential Information as [they] uses with regard to [their] own proprietary information."

38.     In the event that RMG authorized the SEG Defendants to disclose any of RMG's Confidential Information to a third party, § 2.1 of the NDA mandated that the SEG Defendants obtain from the third party "a written agreement: (a) to hold such Confidential Information in confidence and not to use such Confidential Information for any purpose except as it relates to discussions between the parties hereto; and (b) to return such Confidential Information to such party immediately after such third party has completed its work with respect thereto or at such earlier time as may be requested by the other party."

39.     Section 3 of the NDA provides that "[u]pon termination of the discussions and/or business relationship between the parties, each party shall promptly deliver to the other party any and all Confidential Information that pertains to the other party in its possession or under its control."

40.     Section 4 of the NDA states that "[n]othing in this Agreement shall be construed to convey to a party any rights to or license to use, sell, exploit, copy or further develop any Confidential Information pertaining to the other party."

41.     Section 5.1 of the NDA provides that the agreement shall be "construed for all purposes in accordance with the laws of the State of Florida, U.S.A., without regard to the conflict of laws provisions thereof."

42.     Section 5.5 of the NDA provides that "[t]he obligations of this Agreement will be in effect during the period of the parties' discussions and/or business relationship and will survive

for a period of two (2) years thereafter, except for trade secrets for which these obligations will survive for so long as the information remains trade secret protectable by applicable law."

**E. RMG Provides the SEG Defendants with Trade Secrets and Confidential Information in Reliance Upon the Protections of the NDA**

43.     In reliance upon SEG's promise in the NDA to respect the secrecy and integrity of RMG's Confidential Information, to enable discussions of a potential business collaboration between the parties, RMG disclosed its proprietary business concept for a Retail Media Hub and provided the SEG Defendants with detailed proprietary information concerning the development and operation of a potential Retail Media Hub by SEG.

44.     Throughout the period of the parties' discussions, between January 2016 and March 2018, the SEG Defendants induced RMG to provide ever more detailed materials and disclosures based upon the promise of a lucrative business opportunity with the SEG Defendants.

**F. RMG Senior Executives Conduct an Entire Week of Fact-Finding Meetings with SEG in Florida**

45.     In reliance upon the protections of the NDA, in April 2016, Burgess, Robin Drysdale, RMG's Chief Operating Officer, and Alan Moffatt, a Director of RMG, travelled from the United Kingdom to SEG headquarters in Jacksonville, Florida, for an entire a week of fact finding and analysis concerning the design and implementation of a Media Hub for SEG (the "Fact Finding Week").

46.     As part of RMG's fact finding, between April 4 and April 8, 2016, Burgess, Drysdale and Moffatt met with over twenty members of SEG senior management, in over ten separate business groups, to learn about SEG's existing channels of communication. Among other things, during the Fact Finding Week, SEG executives Brandon Benedicto and Mario Mijares advised RMG that SEG was working with Coupons.com, a company owned by Defendant Quotient, which they said provided the back end for electronic coupons on SEG's website.

47.     At the conclusion of the week, at SEG's request, RMG provided a detailed briefing of its initial findings and recommendations concerning the design and implementation of a Retail Media Hub. SEG responded positively and encouraged RMG to prepare a detailed business case for the joint development of a Retail Media Hub for SEG.

## G. RMG Provides a Business Case Document Including its Entire Playbook for Developing a Retail Media Hub

48.     In reliance upon the NDA, on April 27, 2016, RMG delivered to SEG a detailed sixty-two page analysis and project plan (the "Business Case"), entitled "Maximizing Vendor Investment - Delivering a Media Hub," setting forth RMG's concept of a Retail Media Hub and containing and embodying many sensitive confidential and proprietary trade secrets concerning the design and implementation of a Retail Media Hub. RMG would not have prepared and disclosed the Business Case to SEG if the SEG Defendants had not made the promises set forth in the NDA.

49.     The cover page of the Business Case states prominently that "[t]he confidential information contained within this document and all supporting visuals are supplied by Result Marketing Group on the express terms that they may not be copied, used or disclosed to others outside Southeastern Grocers for any purpose except as authorized in writing by Result Marketing Group." The cover page of the Business Case also included a copyright symbol and the words "Copyright Result Marketing Group, April 2016."

50.     The Business Case included many confidential and proprietary RMG trade secrets, including:

- A description of an RMG Retail Media Hub;

- Key insights that RMG learned from prior consultations with other clients, including data collection and operational conclusions;

- A detailed description of a four-stage process for setting up and executing a RMG Retail Media Hub for SEG;

- Detailed findings and results from the initial phases of RMG's analytical review of SEG's business;

- A description of the principles of operation for an RMG-designed Retail Media Hub and a visual representation of the Media Hub from the Result Way of Working;

- A detailed explanation of RMG's planned phases of implementation for a Media Hub and an organizational chart setting forth the specific recommended personnel and roles for the management and operation of the SEG Media Hub;

- A description of the structure of the revenue model for the SEG Retail Media Hub;

- A chart setting forth twenty-six specific monetizable media channels for the SEG Retail Media Hub with estimated costs and net revenues per item;

- Projections of increased revenues in each media channel based upon implementation of SEG Retail Media Hub;

- A plan for phasing out SEG's five existing media partners, while ramping up the SEG Retail Media Hub;

- A 12-month joint engagement plan;

- A detailed description, with flow charts, of the order of operations in each of the processes of the SEG Retail Media Hub—including the Media Hub booking process, Media Hub invoicing process, Media Hub creative process, Media Hub customer promotion and Media Hub reporting process, the look and feel of the vendor interface and calendars for vendor purchases and content delivery; and

- A "media pack" with exemplars of specific forms to be used in the SEG Retail Media Hub.

51.     Mauser and others at SEG received and reviewed all of the foregoing confidential and proprietary materials in the Business Case.

**H.  RMG Provides a Term Sheet Reflecting the Parties' Prior Discussions**

52.     Several weeks after receiving the Business Case from RMG, on May 18, 2016, Mauser sent Drysdale a Microsoft Excel document, entitled "RMG Offer Analysis," proposing how to split the revenues received through the Retail Media Hub project as between RMG and SEG. The RMG Offer Analysis calculated RMG's revenue share at 55% for the first three months, and 35% thereafter, increasing to 40% when cumulative annual revenues exceeded $31 million. The RMG Offer Analysis projected revenue in the first three years of $105,992,130, of which RMG's share would be $38,432,172.

53.     The following day, Drysdale provided Mauser with detailed term sheet for the SEG Media Hub transaction entitled "RMG/SEG Proposal of Principles for Draft Heads of Terms" (the "Term Sheet"). As set forth in the Term Sheet, the parties projected that the implementation of a Retail Media Hub for SEG by RMG would generate incremental revenue to SEG of at least $169 million in the first five years of operation.

54.     As compensation for RMG's intellectual property and services, RMG agreed that it would accept a revenue share of 55% of its net revenue from the Media Hub for the first three months, and 35% thereafter, increasing by 5% for each additional $5 million in net revenue, up to a maximum revenue share of 50%.

55.     The Term Sheet contained further confidential and proprietary trade secret information of RMG concerning the implementation and operation of a SEG Retail Media Hub, including, among other things:

- A description of the Retail Media Hub set-up requirements and governance plan, including detailed descriptions of each requirement and estimated costs;

- A detailed description of the structure and processes of the Media Hub;

- A detailed description of each job function for all Media Hub personnel, including responsibilities, contributions and required skills;

- Set up plan timelines; and

- Estimates of revenue by media channel.

56.     The Term Sheet included the following statement concerning RMG's rights in and to its intellectual property and confidential information:

- RMG will require adequate protections of its unique IP and "Way of Working" to be built into the contract.

- RMG have developed over a period of 10 years a unique business model to maximise the investment by suppliers/vendors/CPGs into retail media.

- The model is offered to clients on the basis that it is licenced to them within commercial terms and remains under direct ownership of RMG throughout the period of any contractual agreement.

- A continuation of the use of the RMG model, following a termination of contract, would be subject to continuation permission being granted in writing by, and a fee being paid to, RMG.

- The model its associated processes, methodology and ways of working remain exclusively the intellectual property of RMG, and cannot be resold even when operating under licence or continuation agreement.

- The model, when adopted, is concerned with the valuation, commercialisation and development of communication channels, campaigns and sponsorships – "Retail Media"

- The purpose of the model is to secure investment from the Supplier / Vendor / CPG base for the Retail Media opportunities identified within the retailers estate.

- Ideas and Initiatives as described in the Value Chain, will be presented under copyright and remain the property of RMG until purchased.

57.     RMG provided the Term Sheet to SEG upon the promise and understanding that SEG would strictly honor the terms of the NDA. RMG would not have provided the Term Sheet to SEG if it had believed that SEG would not abide by the terms of the NDA. Between disclosures in the Fact Finding Week, Business Case and Term Sheet, RMG provided SEG access to its entire "playbook" of proprietary methods and tools for developing and implementing a Retail Media Hub.

58.     On August 1, 2016, after receiving the Term Sheet, Mauser informed Drysdale that "it's not if, it's when' we get started."

## I.     SEG Breaches the NDA by Providing RMG's Confidential and Proprietary Information to Quotient

59.     Despite this assurance by Mauser, SEG delayed in proceeding with RMG on the project. On October 4, 2016, SEG informed RMG that because of delays on its own end, it would not be ready to launch the Media Hub until 2017.

60.     In reality, the SEG Defendants were unlawfully converting RMG's Confidential Information. Upon information and belief, in breach of the NDA, the SEG Defendants disclosed RMG's Confidential Information to their electronic coupon provider, Defendant Quotient.

61.     Upon information and belief, SEG and Quotient then together unlawfully began to develop a Retail Media Hub for SEG based upon RMG's Confidential Information.

62.     In addition, based upon the unlawful disclosure of RMG's Confidential information, Quotient began to develop an entirely new business line developing Retail Media Hubs for other retail customers, without obtaining a license from RMG.

## J.     RMG Continues to Pursue the Project with SEG

63.     In 2017, RMG continued to follow up with the SEG Defendants, pursuing additional meetings and follow-up phone calls.

64.     In or about September 2017, RMG's original point of contact at SEG, Crammond, left the company, and her role was assumed by Mijares.

65.     In December 2017, SEG invited Drysdale and Jack Duncan, Managing Director of RMG, to fly to Florida for several days to play golf with Mauser and reignite discussions concerning the Retail Media Hub project (the "Second Visit"). While on the Second Visit, Drysdale and Duncan were scheduled to meet with Mijares and another SEG executive, Adam Kirk, Head of Trade Planning. However, at the last minute, Mijares and Kirk pulled out and instead sent their junior deputies, Kimberley Jackson, SEG's Deputy Trade Planning, and Gina Bastiani, SEG's Director of Loyalty.

66.     In connection with the Second Visit, the SEG Defendants induced RMG to provide further Confidential Information subject to the NDA, including an updated version of RMG's Retail Media Hub business plan, dated December 2017, entitled "Media Hub 2.0," as well as a presentation of "Case Studies" of RMG's prior successful Retail Media Hub projects.

67.     During the Second Visit, SEG continued to assure RMG that it intended to pursue the Retail Media Hub partnership with RMG, but simply needed more time to get ready.  Upon information and belief, SEG's purpose in inducing RMG to attend the Second Visit and share further Confidential Information was to misappropriate such updated information and provide it to Quotient.

68.     Just a few weeks after RMG's Second Visit, in an email dated March 18, 2018, Mauser stated that "I don't think anyone has an appetite right now for the change it would take to flip our current model." This statement was false.

69.     Mauser led RMG to believe that the decision to indefinitely suspend its development of a Media Hub was motivated by SEG's intent to focus management efforts on its

core business operations. In fact, upon information and belief, the SEG Defendants and Quotient already were developing and implementing a Retail Media Hub based upon RMG's Confidential Information.

**K.  SEG and Quotient Develop the SEG Media Hub Using RMG's Trade Secrets and Confidential Information**

70.     On July 2, 2018, RMG noticed a news story in the trade press announcing that SEG was launching a "Media Hub," the very same business concept that RMG had developed for SEG (using the precisely same name).

71.     Upon further investigation, RMG discovered that SEG and Quotient had issued a joint press release (the "Joint Press Release"), a copy of which is attached hereto as **Exhibit 2**, announcing their partnership in the "SEG Media Hub, a media platform that gives shoppers more relevant digital ad messages and savings."

72.     The Joint Press Release states that the SEG Media Hub is an "extension of the current partnership between SEG and Quotient," which already "powers SEG's digital savings program through its Quotient Retailer iQ™ platform" and "is a key partner for our digital coupons." Contradicting SEG's statements to RMG just a few months earlier, Mijares stated that "[i]t's a priority for us to improve our digital shopper engagement tools with SEG Media Hub at the center of it."

73.     The Joint Press Release further stated:

Three key components make up the new data-driven media platform:

- **Shopper Audience Targeting**: using near real-time purchasing data.

- **Creative Digital Ad Units**: delivering brand equity ads and experiences across all SEG digital channels (mobile, social and web), plus third-party properties, with a call-to-action

integrated into the ad, such as a digital coupon or in-store special.

- **Media Measurement**: using advanced analytics to measure performance by linking ad views to a shopper's purchase.

Quotient's media platform and technology will manage and optimize the entire system. This includes leveraging shopper data collected through its Retailer iQ platform, working with CPG brands or their agencies, and SEG to design advertising and promotional campaigns, creating and executing the media, and measuring the impact on sales.

74. The joint press release described precisely the Retail Media Hub set forth in the Business Case developed by RMG specifically for SEG's business.

75. RMG subsequently examined publicly accessible portions of the SEG Media Hub and confirmed that SEG and Quotient had unlawfully duplicated a substantial portion of RMG's business plan based upon RMG's Confidential Information.

76. Promotional materials concerning the SEG Media Hub, attached hereto as **Exhibit 3**, describe an "omnichannel" solution, offering campaigns in media channels constituting SEG's entire Media Estate, including (1) circulars; (2) truck wraps; (3) targeted direct mail; (4) digital in-store media; (5) cart advertising; (6) in-store passout; (7) tags; (8) receipt coupons; (9) signage; (10) in-store radio; (11) connected shelf coupons; (12) kiosk; (13) sampling; (14) digital circular; (15) digital coupons; (16) targeted email; (17) SEG website; (18) social media; and (19) mobile.

77. Quotient and SEG simply took the detailed project plan, extensive research, analytics and proprietary knowhow provided by RMG subject to the strict terms of the NDA and exploited that proprietary intellectual property to develop the SEG Media Hub, without compensating RMG.

78.   SEG and Quotient also misappropriated the language, content, look and feel of numerous forms for communications with vendors and form advertisements, which RMG had provided as templates for use in a Media Hub, as set forth in **Exhibit 4**.

79.   Upon information and belief, in connection with the development and implementation of the SEG Media Hub, using RMG's trade secrets and confidential information, Quotient engaged in substantial conduct in the State of Florida, including: (a) physical meetings in Florida; (b) the development of a joint business plan and technology with SEG executives and employees located in Florida; (c) integration with the SEG Defendants and the SEG Media Hub on computer servers located in Florida; (d) receipt, processing and distribution of data generated by the SEG Media Hub in Florida; (e) receipt, processing and distribution of the proceeds of media purchases in Florida, from or to the SEG Defendants.

80.   Based upon the parties' Term Sheet, in breaching the NDA and misappropriating RMG's Confidential Information, SEG defrauded RMG of a projected revenue share during the first five years of no less than $59,150,000.

**L.   Quotient Misappropriates RMG's Trade Secrets and Confidential and Proprietary Information**

81.   After wrongfully developing the SEG Media Hub, without license or authorization from RMG, Quotient further misappropriated RMG's trade secrets and Confidential Information, which it knew was subject to the protections of the NDA.

82.   Based upon RMG's trade secrets and Confidential Information, Quotient developed an entirely new line of business—which it terms "Retail Performance Media" (almost identical to RMG's term "Retail Media")—developing substantially similar Retail Media Hub platforms for a number of additional retail partners, including Advantage Media, Ahold Delhaize USA, Albertsons, Dollar General, Giant Eagle, Peapod and Rite Aid.

83.     According to Quotient's public disclosures, Retail Performance Media now accounts for a substantial portion of Quotient's business. The term "Retail Performance Media," and an apparent predecessor term, "Quotient Media Exchange," first appeared in Quotient's public disclosures in early 2017, indicating that Quotient and the SEG Defendants were underway in the development of the SEG Media Hub in 2017—around the time that the SEG Defendants professed to have lost interest in developing a Retail Media Hub with RMG.

84.     As a result of its misconduct in knowingly misappropriating RMG's Confidential Information, and developing and selling its Retail Performance Media platform to end users without a required license from RMG, Quotient is liable for the value of a reasonable royalty to RMG, in an amount to be determined at trial.

**FIRST CAUSE OF ACTION**
**(Breach of the NDA, as against the SEG Defendants)**

85.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

86.     The parties executed the NDA and agreed to be bound by its terms.

87.     RMG fulfilled all of its obligations under the NDA.

88.     RMG and SEG continued their discussions under the NDA concerning a potential business collaboration until March 18, 2018.

89.     During the period of the discussions, and within two years following the termination of discussions, on March 18, 2018, SEG breached the NDA by, among other things, misappropriating and using RMG's Confidential Information, including the concept of a Retail Media Hub and the specific details concerning the development and implementation of a Retail Media Hub for SEG, and disclosing RMG's Confidential Information to Quotient.

90.     In the Term Sheet, the parties reached substantial agreement on the financial terms of their relationship, including that RMG would receive a revenue share of 55% of SEG's net

21

revenue from the Retail Media Hub for the first three months, and 35% thereafter—increasing by 5% for each additional $5 million in net revenue, up to a maximum revenue share of 50%.

91.     As a direct and proximate result of SEG's breaches, RMG suffered damages, including but not limited to value of its misappropriated trade secrets and Confidential Information and the loss of the revenue share that would have been earned from the SEG Media Hub had SEG honored the terms of the NDA.

## SECOND CAUSE OF ACTION
### (Violation of Defense of Trade Secrets Act, as against All Defendants)

92.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

93.     Plaintiff is the owner of trade secrets that are related to products and services used and intended for use in interstate commerce, including services relating to multi-channel media campaigns across state lines, and relating to products that manufactured, distributed and sold nationwide.

94.     Such trade secrets relate to, among other things: (a) Plaintiff's "play book" for designing, launching and implementing an effective Retail Media Hub; (b) the collection of key insight, data collection methods, and operational strategies RMG has developed over the years from its experience designing and implementing Retail Media Hubs; (c) step-by-step processes for setting up and executing a Retail Media Hub; (d) specific descriptions of phases of implementation and optimal team structure; (e) methods for identifying specific media opportunities and tailoring those opportunities to particular users and circumstances; (f) methods for implementing media opportunities within a Retail Media Hub, including calculating estimates of optimal frequencies and costs; (g) development of short, medium, and long term implementation plans for a Retail Media Hub; and (h) methods for identifying the particular processes to be used in executing the Retail Media Hub, such as booking, invoicing, creative, customer promotion.

95.     In addition to these processes, practices, methods, knowhow, compilations of information and other proprietary trade secrets, Plaintiff's trade secrets also relate to its proprietary research and analysis of SEG's business and the specific application of those processes, practices, methods, comprising (among other things), specific operational steps, media opportunities, implementation plans and detailed staffing requirements, customized and optimized for SEG using Plaintiff's proprietary methods and techniques.

96.     Plaintiff's trade secrets derive independent economic value from not being generally known to others and not being readily ascertainable by proper means by others.

97.     Plaintiff takes reasonable means to protect the secrecy of its trade secrets, including requiring all actual or prospective business partners to commit to maintaining confidentiality.

98.     As described herein, Defendants willfully and maliciously misappropriated Plaintiff's proprietary trade secrets, in bad faith, to generate lucrative revenues without having to pay Plaintiff fair compensation in the agreed form of an allocation of revenues generated in return for a license to use Plaintiff's trade secret information.

99.     By reason of the foregoing, Plaintiff is entitled to damages in an amount to be proved at trial, including statutory double damages, as well as an award of its attorneys' fees and costs.

## THIRD CAUSE OF ACTION
### (Violation of the Florida Uniform Trade Secrets Act, as against All Defendants)

100.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

101.     Plaintiff is the owner of trade secrets that derive independent economic value from not being generally known to others and not being readily ascertainable by proper means by others.

102.     Such trade secrets relate to, among other things: (a) Plaintiff's "play book" for designing, launching and implementing an effective Retail Media Hub; (b) the collection of key

insight, data collection methods, and operational strategies RMG has developed over the years from its experience designing and implementing Retail Media Hubs; (c) step-by-step processes for setting up and executing a Retail Media Hub; (d) specific descriptions of phases of implementation and optimal team structure; (e) methods for identifying specific media opportunities and tailoring those opportunities to particular users and circumstances; (f) methods for implementing media opportunities within a Retail Media Hub, including calculating estimates of optimal frequencies and costs; (g) development of short, medium, and long term implementation plans for a Retail Media Hub; and (h) methods for identifying the particular processes to be used in executing the Retail Media Hub, such as booking, invoicing, creative, customer promotion.

103.   In addition to these processes, practices, methods, knowhow, compilations of information and other proprietary trade secrets, Plaintiff's trade secrets also relate to its proprietary research and analysis of SEG's business and the specific application of those processes, practices, methods, comprising (among other things), specific operational steps, media opportunities, implementation plans and detailed staffing requirements, customized and optimized for SEG using Plaintiff's proprietary methods and techniques.

104.   Plaintiff takes reasonable means to protect the secrecy of its trade secrets, including requiring all actual or prospective business partners to commit to maintaining confidentiality.

105.   By reason of the foregoing, Plaintiff is entitled to damages in an amount to be proved at trial, as well as an award of its attorneys' fees and costs.

### FOURTH CAUSE OF ACTION
#### (Civil Theft Under Fla. Stat. § 772.11, as against All Defendants)

106.   Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

107.   Under Fla. Stat. § 772.11, a civil plaintiff is entitled to an award of treble damages, attorneys' fees and court costs to remedy the taking of, or infringement upon, the "property of

another," including intangible rights, privileges, interests, and claims. *See* Fla. Stat. § 812.012 (4)(b) & (5). Misappropriation of trade secrets and other confidential and proprietary business information constitutes civil theft within the ambit of Fla. State. § 772.11. *See* Fla. Stat. § § 812.014(1) & 812.081(2).

108.   Defendants unlawfully deprived RMG of the right to, or the benefits of, RMG's trade secrets and Confidential Information and unlawfully appropriated such valuable commercial property of RMG to their own unauthorized use.

109.   Defendants, with the intent to deprive or withhold from RMG the control of its trade secrets and Confidential Information, or with an intent to appropriate them to their own use, unlawfully stole or embezzled RMG's trade secrets and Confidential Information without authority and unlawfully made or caused to be made copies of RMG's trade secrets and Confidential Information.

110.   Defendants unlawfully initiated, organized, planned, financed, directed, managed, or supervised the theft of RMG's trade secrets and Confidential Information. Defendants unlawfully trafficked in, or endeavored to traffic in, the sale or distribution of RMG's trade secrets and Confidential Information.

111.   By letter dated April 5, 2021, RMG advised Defendants that they had committed civil theft under Fla. State. § 772.11 and demanded that "each immediately provide an accounting to RMG of all revenue and profits they have received in connection with the SEG Media Hub and Quotient's Retail Performance Media business, to enable the parties to discuss an appropriate remedy." Defendants each refused to comply with Plaintiff's request and to remedy their theft of RMG's intellectual property.

112.    As a direct and proximate result of the foregoing unlawful conduct, RMG suffered damages, in an amount to be proved at trial. Such damages are trebled under Fla. Stat. § 772.11.

113.    Based upon the assumption that the SEG Media Hub is on track to generate incremental revenues akin to those projected in the Term Sheet, RMG is entitled to an award against the SEG Defendants of no less than $177,450,000. Quotient is jointly and severally liable for this amount.

114.    RMG lacks information concerning the revenues Quotient has separately derived from its Retail Performance Media business, by virtue of Quotient's misconduct, which is peculiarly in its possession and under its control. However, under Fla. Stat. § 772.1, RMG is entitled three times the amount of a reasonable royalty for the use of RMG's Confidential Information, had the parties duly negotiated a market rate. The SEG Defendants are jointly and severally liable for this amount.

### FIFTH CAUSE OF ACTION
#### (Tortious Interference with Contract, as against Quotient)

115.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

116.    Upon information and belief, Defendant Quotient was aware of the NDA between RMG and SEG.

117.    Upon information and belief, Quotient intentionally and unjustly interfered the NDA by willfully accepting and/or encouraging SEG's improper disclosure of confidential RMG information subject to the NDA.

118.    By reason of the foregoing, Plaintiff is entitled to damages in an amount to be proved at trial, as well as an award of its attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
### (Tortious Interference with Prospective Business Relationships, as against Quotient)

119.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

120.    Upon information and belief, Defendant Quotient was aware of the prospective business relationship between RMG and SEG.

121.    Upon information and belief, Quotient intentionally and unjustly interfered with these prospective relationships by willfully accepting and/or encouraging SEG's improper disclosure of confidential RMG information subject to the NDA and then using that information to usurp the business opportunity and divert the revenues of that opportunity to itself.

122.    By reason of the foregoing, Plaintiff is entitled to damages in an amount to be proved at trial, as well as an award of its attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION
### (Unjust Enrichment as Against all Defendants)

123.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

124.    As a result of the foregoing misconduct, Defendants have been unjustly enriched.

125.    Plaintiff is entitled to receive an award equal to the fair and reasonable value of its intellectual property in an amount to be proved at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that the Court:

a)  Enter judgment against Defendants and in favor of Plaintiff;

b)  Award Plaintiff its compensatory damages in an amount to be proven at trial, plus applicable multiple damages.

c)  Impose a constructive trust upon all work product and intellectual property derived from and proceeds of Plaintiff's intellectual property in the hands of Defendants;

d)  Award Plaintiff appropriate punitive damages;

e)  Award Plaintiff interest, reasonable costs, attorney's fees, and disbursements;

f)  Grant such other relief as it deems necessary and proper.

Dated: Boca Raton, FL
June 18, 2021

**MEDINA LAW FIRM LLC**

By:
Eric S. Medina, Esq.
Florida Bar #72179
Medina Law Firm LLC
1199 S. Federal Highway
Suite 421
Boca Raton, FL 33142
Phone: (954) 546-0980
Fax.  (888) 833-9534
emedina@medinafirm.com
*Attorneys for Plaintiff*

**FRIDMAN FELS & SOTO, PLLC**

/s/ Alejandro O. Soto
Alejandro O. Soto, Esq.
Florida Bar #0172847
Fridman Fels & Soto, PLLC
2525 Ponce de Leon Blvd., Suite 750
Coral Gables, FL 33134
T 305 569 7707
F 786 627 4145
asoto@ffslawfirm.com
*Co-Counsel Medina Law Firm LLC*

*Of Counsel:*

PRESS KORAL LLP
Matthew J. Press
Jason M. Koral
641 Lexington Avenue, 13th Floor

New York, NY  10022
Phone: (212) 922-1111

## JURY DEMAND

**PLEASE TAKE NOTICE** that Plaintiff demands a trial by jury on all issues so triable.

Dated: Boca Raton, FL
June 18, 2021

Respectfully submitted,
**MEDINA LAW FIRM LLC**

By: _____
Eric S. Medina, Esq.
Florida Bar #72179
Medina Law Firm LLC
1199 S. Federal Highway
Suite 421
Boca Raton, FL 33142
Phone: (954) 546-0980
Fax.  (888) 833-9534
emedina@medinafirm.com
*Attorneys for Plaintiff*

*Of Counsel:*

PRESS KORAL LLP
Matthew J. Press
Jason M. Koral
641 Lexington Avenue, 13th Floor
New York, NY  10022
Phone:  (212) 922-1111