## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

RESULT MARKETING GROUP, LTD.,

     Plaintiff,

                             Case No. 3:21-cv-611-TJC-JBT

v.

SOUTHEASTERN GROCERS, LLC,
BI-LO, LLC, & WINN-DIXIE
STORES, INC.,

     Defendants.

_____

### O R D E R

This case arises from a soured business relationship between Plaintiff Result Marketing Group, Ltd., and Defendants Southeastern Grocers, LLC, Bi-Lo, LLC, and Winn-Dixie Stores, Inc., (collectively "Southeastern"). Before the Court are Result's objection to the magistrate judge's order denying two discovery motions, Southeastern's motion for summary judgment, and Southeastern's and Result's dueling motions to exclude expert testimony.

## I.    Background

Result is a United Kingdom marketing agency that helps retailers generate income separate from their retail sales. Doc. 80 ¶¶ 9, 18. Under Result's model, advertisers can purchase access to the retailers' various media, including "(1) the retailer's printed circulars and advertisements; (2) in store

posters, banners, 'shelf talks,' 'shelf takes' and other printed material; (3) shopping cart noses; (4) in-store audio recordings; (5) the retailer's website; (6) the retailer's digital marketing, including email and social media; and (7) the retailer's television marketing." Id. ¶ 20. To facilitate this, Result developed a "Media Hub," which it describes as a "centralized interface" between the retailer and advertisers that allows advertisers to "explore and purchase" the various advertising opportunities. Id. ¶ 19.

According to Result, the Media Hub "allows the retailer to create campaigns to promote the sale of media," "allows the retailer to set and optimize prices for the purchase of advertising" opportunities, provides advertisers "with a means of submitting content, using consistent templates, for seamless operation," and "enables the retailer to generate performance reports that can be sold to media buyers, stimulating further media purchases." Id. ¶ 21.

In October 2015, Result created a document detailing its business principles titled *The Result Way of Working*, in which it describes how it develops media hubs for retailers, details its own operations, and cites its decades of experience. Doc. 175-1.

In 2016, Result pitched its "Retail Media Hub" concept to Southeastern. Doc. 80 ¶¶ 33, 45. At the time, Result had not operated in the United States, and Southeastern was receiving digital coupon services from Quotient Technology, Inc. See Doc. 162 at 2, 7; Doc. 172 at 2, 8. Result sent Southeastern

a slide deck providing an overview of the media hub. Doc. 80 ¶ 33; <u>see</u> <u>also</u> Doc.

162-3 (slide deck). The front page contains this language:

> The confidential information contained within this document and all supporting visuals are supplied by Result . . . on the express terms that they may not be copied, used or disclosed to others outside Southeastern . . . for any purpose except as authorised in writing by Result Marketing Group.© Copyright Result Marketing Group, February 2016[.]

Doc. 162-3 at 4.

Approximately a month later, Result and Southeastern executed a non-disclosure agreement ("NDA") to protect confidential information, including but not limited to trade secrets, intellectual property, and information on business practices. Doc. 80-1. The NDA does not cover information "rightfully known by [the recipient before the recipient's] contact with the other party . . . without any limitation on use or disclosure," "rightfully in the public domain," "independently developed without any reference to or use of the other party's [c]onfidential [i]nformation," or provided by a third party who lawfully possessed it without an obligation of confidentiality. <u>Id.</u> ¶ 1.1. The NDA applied "during the period of the parties' discussions and/or business relationship and . . . for a period of two . . . years thereafter, except for trade secrets for which the[] obligations will survive for so long as the information remains trade secret protectable by applicable law." <u>Id.</u> ¶ 5.5.

Soon after, Result representatives traveled to Florida to meet with Southeastern's marketing team, collected data, and performed a market analysis. Doc. 80 ¶¶ 47–50. Result produced another slide deck and a proposal of terms. Doc. 162-4 (slide deck); Doc. 162-5 (document). The slide deck includes additional descriptions of Result's model, information from *The Result Way of Working*, information Result gathered during market research, analysis, and various recommendations. See generally Doc. 162-4. Among other things, the proposal of terms includes a business plan and revenue projections. Doc. 162-5 at 5–15. The projected gross revenue over five years was $169 million. Id. at 15. The parties began to negotiate Result's share of the revenue and continued to communicate but never finalized or implemented a business agreement. See Doc. 162 ¶¶ 9, 11; Doc. 172 ¶¶ 18–20.

In October 2017, Result representatives traveled to Florida again to "reignite" discussions with Southeastern. Doc. 80 ¶ 67. Result provided an updated version of the business plan and a presentation of case studies based on Result's previous media hub projects. Id. ¶ 69.

In March 2018, Southeastern informed Result that it did not want to "flip" its "current model." Id. ¶ 71. This terminated the parties' discussions. Id. ¶ 97.

In June 2018, Southeastern and Quotient (Southeastern's digital coupon provider) issued a joint press release announcing their partnership to launch

4

"SEG [Southeastern Grocers] Media Hub."[1] Id. ¶ 76; see also Doc. 80-2 (press release). In the press release, they describe the SEG Media Hub as "a media platform that gives shoppers more relevant digital ad messages and savings" and "the only place where a consumer packaged goods (CPG) brand can target [Southeastern] shoppers with relevant and effective digital advertising[.]" Doc. 80-2 at 2. The press release contains these details:

- "With SEG Media Hub, brands can tailor their ad campaigns to target the right shopper across all of [Southeastern's] digital properties, Quotient's flagship consumer brand, Coupons.com, and third-party properties across the web, including major digital publishers and social media channels."

- "Quotient's media platform and technology will manage and optimize the entire system. This includes leveraging shopper data collected through its Retailer iQ platform, working with CPG brands or their agencies, and [Southeastern] to design advertising and promotional campaigns, creating and executing the media, and measuring the impact on sales."

Id. at 2, 3.

Southeastern published promotional materials describing the SEG Media Hub as an "omnichannel" solution offering advertisers access to nineteen options: circulars, truck wraps, targeted direct mail, digital in-store media, cart advertising, in-store "passout," tags, receipt coupons, signage, in-store radio, connected shelf coupons, kiosks, sampling, digital circulars, digital coupons,

---

[1]SEG Media Hub was renamed to SEG Connects in 2019. Doc. 151 at 20:12–14, 20:25–21:26.

targeted emails, Southeastern's website, social media, and mobile. Doc. 80-3 at 10, 13.

Additional SEG Media Hub promotional material includes slides structured similarly to the decks provided by Result, including duplicated stock photos and similar language, fonts, colors, and layouts. <u>See</u> Doc. 80-4 (side-by-side comparison of the Southeastern promotional slides and Result's slides).

In October 2018, Result's Chief Operating Officer, Robin Drysdale, emailed Southeastern's general counsel, Sandy Grimm, to "make [him] aware of what [Result] consider[s] to be a potentially serious and damaging breach of business confidence[.]" Doc. 174-25 at 1–2. Grimm and Drysdale spoke on the telephone multiple times. Doc. 158 ¶ 14. According to Drysdale, "Grimm pretended that all [Southeastern] had taken from [Result] was the name 'SEG Media Hub,' and offered to change the name of the media hub to something else." <u>Id.</u>

## II.    Procedural Posture

Result's Amended Complaint, Doc. 80, sues Southeastern for breach of the NDA (count I, <u>id.</u> ¶¶ 90–100) and unjust enrichment (count VI, <u>id.</u> ¶¶ 146–55), Quotient for tortious interference with contract (count IV, <u>id.</u> ¶¶ 123–33) and tortious interference with prospective business relationships (count V, <u>id.</u> ¶¶ 134–45), and both Southeastern and Quotient for violation of the Defend Trade Secrets Act (count II, <u>id.</u> ¶¶ 101–11) and Florida Uniform Trade Secrets

Act (count III, id. ¶¶ 112–22). Result and Quotient settled, and the Court dismissed the claims against Quotient. Docs. 100, 121.

The assigned magistrate judge, the Honorable Joel Toomey, conducted a hearing on two motions to compel by Result and one motion to compel by Southeastern. See Docs. 98, 116, 117 (motions); Doc. 151 (hearing transcript). Judge Toomey took Southeastern's motion under advisement and directed the parties to confer and notify the Court as to which issues remained. Doc. 149 at 2. The parties resolved the issues, Doc. 168, and Judge Toomey denied Southeastern's motion as moot, Doc. 169. Judge Toomey also denied Result's motions but permitted Result to request spoliation sanctions at summary judgment and trial. Doc. 149 at 2. Result objects to the denial of its motions and renews its request for spoliation sanctions. Doc. 164. Other than these objections, discovery is now closed.

Southeastern moves for summary judgment on the remaining claims. Doc. 139 (redacted version); Doc. 162 (sealed version).[2] Southeastern also moves to exclude expert testimony by Result's damages expert, Marc Reid. Doc. 137 (redacted version); Doc. 161 (sealed version). Result moves to exclude expert

---

[2]Many of the parties' filings are on the public docket in redacted form and on the sealed docket in unredacted form. The Court cites both versions upon first mention and only the sealed versions for remaining references.

testimony by Southeastern's trademark expert, Dominique Hanssens. Doc. 138 (redacted version); Doc. 177 (sealed version).

The motions are fully briefed, and the Court conducted a hearing on the motions. <u>See</u> Docs. 137–42, 146, 154–66, 170, 172–77 (briefing); Doc. 178 (hearing minutes); Doc. 179 (hearing transcript).

## III.   Result's Objection to Judge Toomey's Order

Result moved to compel Quotient to produce documents obtained through searching specific terms and names, documents showing its revenues and profits from its partnership with Southeastern, and documents concerning Quotient's development of media hub concepts before 2018. Doc. 98 ¶¶ 61–70. In the same motion, Result asked the Court to compel Southeastern to produce attachments to emails already produced, documents concerning the SEG Media Hub and related programs (including ones developed with business partners other than Quotient), documents concerning revenues and other benefits obtained from the SEG Media Hub, and any pre-2018 communications between Southeastern and Quotient concerning the development of a media hub. <u>Id.</u> ¶¶ 73–80.

In a second motion, Result asked the Court to compel Southeastern to provide the exact circumstances of the deletion of certain documents before litigation began, permit Result to depose a Southeastern witness with knowledge about the deletion, and impose sanctions for the deletion; produce a

second "30(b)(6) witness" to sit for a deposition because the original was purportedly unprepared and unable to answer basic questions;[3] and produce a third-party witness to respond to a deposition question concerning gross revenues earned by SEG Connects (a successor of SEG Media Hub eventually serviced by a company other than Quotient). Doc. 116 at 13–14.

Judge Toomey conducted a hearing on both motions. See Doc. 151 (hearing transcript). He denied Result's first motion because Result filed it near the end of discovery and the requested discovery concerned Southeastern's business relationships with other entities after its relationship with Quotient had ended, finding the Amended Complaint is limited to Southeastern's dealings with Quotient. Doc. 151 at 23:20–24:5, 24:10–15, 25:2–11, 26:3–5, 30:15–23. Judge Toomey added that Result's motions were "inadequate," "ad hoc," and "thrown together at the last minute" without "supporting affidavits," relying instead on "he-said/she-said." Id. at 31:3–9.

Judge Toomey denied Result's second motion as well. Doc. 149 at 2. Regarding the deleted documents, Judge Toomey explained that Result had waited too long to request the written explanation and deposition. Doc. 151 at 52:12–18. He denied the request for spoliation sanctions without prejudice to

---

[3] Federal Rule of Civil Procedure 30(b)(6) permits a party to name a business entity as a deponent and requires the named entity to produce an officer, director, managing agent, or other witness who consents to testify.

Result raising the issue again at summary judgment or trial. <u>Id.</u> at 55:7–13. Regarding the 30(6)(b) witness, he explained that he had no basis to grant the requested relief because Result had not filed a deposition transcript. <u>Id.</u> at 36:20–37:25, 38:5–6. Regarding the third-party witness, he explained that the motion was improper and the correct procedure would have been to file a motion for contempt against the witness directly in the district where she resides. <u>Id.</u> at 34:23–25, 36:18–19. Result objects to Judge Toomey's order. Doc. 164.

If a party objects to a magistrate judge's order, the district judge must "modify or set aside any part of the order that is clearly erroneous or is contrary to law." Fed. R. Civ. P. 72(a). "Clear error is a highly deferential standard of review." <u>Holton v. City of Thomasville School Dist.</u>, 425 F.3d 1325, 1350 (11th Cir. 2005). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." <u>Anderson v. City of Bessemer City</u>, 470 U.S. 564, 573 (1985) (quoted authority omitted). A magistrate judge's order is "contrary to law" if it fails to apply or misapplies relevant statutes, cases, or rules. <u>E.g.</u>, <u>Jackson v. Dep't of Children & Families</u>, No. 3:22-cv-321-BJD-JBT, 2022 WL 21747331, at *2 (M.D. Fla. July 1, 2022); <u>TemPay, Inc. v. Biltres Staffing of Tampa Bay, LLC</u>, 929 F. Supp. 2d 1255, 1260 (M.D. Fla. 2013).

For the first motion, Result argues denial was improper because the motion was timely, Southeastern's failure to produce the requested discovery was improper and based on boilerplate objections, and the requested discovery is relevant. Doc. 164 ¶¶ 27–31. Specifically, Result asserts that Judge Toomey focused too heavily on narrative paragraphs in the Amended Complaint instead of on the crux of the claims. Id. ¶¶ 32–34. Result argues that the denial of the request to compel a third-party witness to answer a deposition question on procedural grounds was error because "the Compel Motion plainly identified the request for financial information and sought an order compelling its production." Id. ¶ 35.

For the second motion, Result argues that denying sanctions was error because Southeastern admitted to deleting documents, "there are good reasons to believe that intentional conduct was involved," and Southeastern's counsel explained the circumstances around the deletion vaguely at the hearing. Id. ¶¶ 38–41. Result asks the Court to "take up the Magistrate [Judge]'s suggestion and rule on the spoliation motion: (1) precluding [Southeastern] from arguing that it developed its media hub based on public sources or any other source other than [Result's] confidential information, and (2) compelling [Southeastern] to provide meaningful and complete detail about the circumstances of its destruction." Id. ¶ 42. Result adds that Southeastern's "only defense . . . was its argument that the documents were deleted before a

11

duty to preserve attached" but argues that deletion could have happened after the suit was filed, and in any case, communications before filing should have put Southeastern on notice of potential litigation. Id. ¶ 43–46.

Judge Toomey's order is not clearly erroneous or contrary to law. The Amended Complaint is explicitly based on Southeastern's development of a media hub during its partnership with Quotient, not after. Moreover, Judge Toomey denied further discovery in part based on how late Result requested the discovery and on the inadequacy of Result's motion. Result's request came too late for the Court to consider it before the close of discovery, and Judge Toomey was within his discretion to decline to reopen discovery. Finally, Judge Toomey is correct that moving to compel Southeastern to require a third-party witness to answer a deposition question was procedurally improper. See Fed. R. Civ. P. 37(a)(2) ("A motion for an order to a nonparty must be made in the court where the discovery is or will be taken.").

Because Result asks the Court to set aside Judge Toomey's order denying sanctions but does not move separately for sanctions at this stage, the Court's spoliation analysis is limited to whether denying sanctions without prejudice was clearly erroneous or contrary to law.[4]  It was not. Judge Toomey determined

---

[4]Result suggests the Court should "rule on the spoliation motion," Doc. 164 ¶ 42, but Judge Toomey has already denied the motion. The effect of the denial without prejudice was to permit Result to file a new motion, which Result has not done.

that the spoliation issue would more appropriately be considered at summary judgment or trial. This too was within his discretion.

Because Result fails to show that Judge Toomey's order was clearly erroneous or contrary to law, the objections are overruled.

## IV. Southeastern's Motion for Summary Judgment

A court must grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To show the absence of a genuine dispute of material fact, a movant must cite to materials in the record or show that an adverse party cannot produce admissible evidence to support a fact. Fed. R. Civ. P. 56(c). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To defeat a properly supported motion, the nonmoving party must produce its own evidence to "designate specific facts showing that there is a genuine issue for trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986) (internal quotation marks omitted).

"Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived." In re Egidi, 571 F.3d 1156, 1163 (11th Cir. 2009); see also Grasso v. Grasso, 131 F. Supp. 3d 1303, 1309 (M.D. Fla. 2015) ("District Courts, including this one, ordinarily do not consider arguments raised for the first time on reply." (quoted authority omitted)). A

party "must not be allowed to embellish an argument in a reply brief when it failed to fully raise and address the issue in its initial brief." In re Egidi, 571 F.3d at 1163. "Such a practice unfairly impedes the [other party's] response." Id.

### a.  *Alleged Breach of the Non-Disclosure Agreement (Count I)*

In Florida, a claim for breach of contract—including breach of an NDA—has three elements: "(1) a valid contract; (2) a material breach; and (3) damages." Friedman v. N.Y. Life Ins. Co., 985 So. 2d 56, 58 (Fla. 4th DCA 2008).

At summary judgment, Southeastern does not argue against the existence of a valid contract or a material breach.[5]  As to damages, Southeastern argues that Result's only evidence is the lost profits analysis by expert Marc Reid, which Southeastern moves to exclude (discussed below). Doc. 162 at 24. Without citation or further explanation, Southeastern adds that damage from a breach cannot be "that [Result] would have gotten the contract with [Southeastern] that it had already rejected before any alleged breach of the NDA occurred."[6] Id. Southeastern concludes, "[Result] was required to come

---

[5] In arguing against misappropriation, Southeastern emphasizes that Result shared slide decks with Southeastern before the parties executed the NDA. Doc. 162 at 22 & 14 n.6. Because Southeastern does not argue breach at summary judgment, the Court need not consider whether the slide decks were subject to the NDA.

[6] Whether Southeastern means that Result rejected the contract or that Southeastern rejected the contract is unclear. In any case, whether a contract

14

forward with evidence as to how the alleged breach injured it or caused it damages under a breach of contract theory. It has not done so." <u>Id.</u> at 24–25 (internal footnote omitted).

Result responds that lost profits are recoverable and argues, "Had the NDA been fully performed, [Southeastern] would have only had two options: proceed with a revenue sharing agreement with [Result] or eschew the media hub concept for at least two years. Because [Southeastern] actually chose to implement a media hub, fair compensation requires that [Result] receive the profits it reasonably expected from that implementation." Doc. 172 at 19.

The Court is unpersuaded that Reid's testimony is Result's only evidence of damages. Whether the alleged breach of the NDA enabled Quotient to provide services Southeastern otherwise could have obtained only from Result—and thus led to Southeastern declining to work with Result—is a question of fact for the jury. Loss of a business opportunity would constitute damages. And evidence of the value of that opportunity—apart from Reid's testimony—is admissible, including some of the documents Reid relied on to form his opinion.[7]

_____

was rejected or simply failed to materialize is a question of fact for the jury.

[7]In any event, the Court is also denying the <u>Daubert</u> challenge to Reid's testimony. <u>See</u> <u>infra</u> section IV.

Because Southeastern fails to show the absence of a genuine dispute of material fact, summary judgment on the breach of the NDA claim (count I) is unwarranted.

### b.      *Alleged Misappropriation of Trade Secrets (Counts II & III)*

"To support a claim for misappropriation of trade secrets, [a plaintiff] must show that (1) it had a trade secret and (2) the opposing party misappropriated the trade secret." Camp Creek Hosp. Inns, Inc. v. Sheraton Franchise Corp., 139 F. 3d 1396, 1410 (11th Cir. 1998).

The Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836 et seq., and the Florida Uniform Trade Secret Act ("FUTSA"), §§ 688.001–688.009, Fla. Stat., define "trade secret" substantially the same: under both, a trade secret is information that (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use and (2) is the subject of reasonable measures to maintain its secrecy. 18 U.S.C. § 1839(3); § 688.002(4), Fla. Stat. Not all confidential information qualifies as a trade secret, and "[w]hether a particular type of information constitutes a trade secret is a question of fact." Camp Creek Hosp. Inns, Inc., 139 F. 3d at 1410–11.

As relevant here, misappropriation involves disclosing or using another's trade secret without the other's consent by someone who knows or has reason

16

to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to maintain secrecy or limit use. 18 U.S.C. § 1839(5)(B)(ii)(II); § 688.002(2)(b)2.b., Fla. Stat.[8]

---

[8]Result identifies nineteen allegedly misappropriated trade secrets, see Doc. 53-1 at 5–8:

(1) Result's "confidential and proprietary concept of a monetizable retailer 'Media Estate,' consisting of all media channels proprietary to the retailer (such as all forms of advertising and marketing media including in-store advertising space, digital media, and hard copy media)";

(2) Result's "concept of an integrated 'Media Hub' which enables vendors to develop integrated marketing campaigns across a retailer's media channels and transforms a retailer's marketing from a cost center into a profit center";

(3) Result's "confidential analysis of [Southeastern's] existing vendor marketing, marketing channels and marketing partners and opportunities for monetizing [Southeastern's] marketing channels through a Media Hub";

(4) Result's "detailed operational model for implementing a retailer Media Hub, including for the valuation, commercialization and development of communication channels, campaigns and sponsorships";

(5) Result's "process for developing, launching, and implementing a retailer Media Hub, consisting of five distinct phases and fifty-five specifically enumerated and described elements";

(6) Result's "confidential twelve-month implementation plan for the SEG Media Hub, including a timeline for phasing out existing marketing vendors and transitioning to a Media Hub, a staffing plan and a team recruitment plan";

(7) "[a] series of tools, methods, processes and evaluative metrics . . . for monetizing and optimizing a retailer's financial return on its Media Estate through a retailer Media Hub";

(8) Result's "detailed model for the Media Hub, including [Result's] identification and detailed description of the specific processes and data flows to be used in booking, invoicing, creative and customer promotion, including examples of the forms and calendars to be used";

(9) Result's "proprietary financial model for licensing and providing services in connection with a retailer Media Hub, including the Set-up fee, Monthly operational fee and Revenue share, and projected revenues for the first three years";

(10) Result's "confidential pricing and revenue analysis for [Southeastern's] available media channels";

Southeastern argues that Result cannot provide sufficient evidence of misappropriation because (1) no documents or testimony show communication of trade secrets by Southeastern to Quotient and (2) Result cannot show that Southeastern used any of its trade secrets with Quotient because the term "Media Hub" was publicly available, Southeastern used images found on the internet when launching its media hub and publishing its promotional slides, and the media hub Southeastern launched differs significantly from the one Result proposed. Doc. 162 at 16–19. Alternatively, Southeastern argues that Result failed to maintain the confidentiality of the alleged trade secrets, and

---

(11) Result's "confidential analysis of [Southeastern's] existing marketing campaigns";

(12) Result's "confidential analysis of [Southeastern's] media inventory and revenue potential by marketing channel, including the identification and description of twenty-six specific media opportunities, specifying the nature of the opportunity, frequency, CPT, and revenue";

(13) Result's "confidential analysis of opportunities to integrate with [Southeastern's] marketing and coupon partner, Catalina, to increase revenues, and analysis of projected revenues";

(14) "[d]etailed proposed terms for contract between [Result] and [Southeastern]";

(15) "[i]temized outline of projected costs of establishing a Media Hub";

(16) "[i]temized outline of projected monthly costs of operating a Media Hub";

(17) "[d]etailed description of job roles and qualifications of team members to be hired by [Southeastern] to manage Media Hub operation";

(18) "[d]etailed timeline and plan for implementation of Media Hub and projected first year revenue by media channel"; and

(19) "[a] media pack of specific forms to be used in connection with the SEG Media Hub provided confidentially to [Southeastern.]"

18

the alleged trade secrets were generally known or readily accessible to third parties and thus were not trade secrets. Id. at 19–23. Finally, Southeastern argues that summary judgment on misappropriation is warranted because Result cannot sufficiently show damages. Id. at 23–24.

As to communication of trade secrets, Result responds that some of the evidence on which Southeastern relies is inadmissible, Southeastern "points to the disclosure of only the most general descriptions of [Result's] business," and Result took reasonable measures to protect trade secrets. Doc. 172 at 21–23. As to use of trade secrets, Result responds that Southeastern copied Result's material into a company Dropbox and then used that Dropbox to develop its material for its own media hub, including duplicating Result's material. Id. at 23. Result adds that Southeastern employees could not recall at deposition where they had obtained the material, and Southeastern "did not produce a single draft, notes, 'Google search' or any other evidence corroborating" the assertion that the duplication of Result's material was coincidental. Id. at 24. As to disclosure of trade secrets, Result responds that Southeastern deleted the Dropbox audit trail, but Quotient produced emails establishing that Southeastern had provided it with access to Dropbox. Id. at 25. Result adds that whether Southeastern disclosed trade secrets is immaterial because unauthorized use of trade secrets—even without disclosure to others—is misappropriation. Id. at 25–26. Finally, Result observes that any lack of

evidence of disclosure stems from the deletion of or refusal to produce the evidence. Id. at 26. As to damages, Result responds that the digital media receipts in evidence are enough to defeat summary judgment and adds that Southeastern improperly relies on the exclusion of Reid's testimony. Id. at 26–27.

Southeastern replies that Result has failed to identify use or disclosure of the alleged trade secrets and emphasizes that "[b]asic marketing concepts" in publicly available materials are not trade secrets. Doc. 165 at 1–5.

Southeastern fails to show the absence of a genuine dispute of material fact. Even without copies of direct communication between Southeastern and Quotient or deposition testimony of the same, the marked similarities between the materials Result provided to Southeastern and the materials Southeastern developed with Quotient are admissible evidence of both disclosure and use of Result's confidential information. The weight of that evidence is for the jury to decide. As to the public availability of the information, Southeastern relies on the availability of general concepts and stock photos and addresses only a few specific items, but many of the alleged trade secrets involve information Southeastern does not contend is publicly available (including specific figures and projections). Whether the alleged trade secrets encompass more than the general, publicly available concepts remains a disputed issue of fact, as does whether any non-public information constitutes trade secrets.

Southeastern's contention that, as a matter of law, Result failed to protect the alleged trade secrets is unpersuasive. Southeastern relies on (1) Result's publication on its website of an overview of its media hub concept and various projects and (2) the slides Result provided to Southeastern before the parties executed the NDA. See Doc. 162 at 6, 10, 22. Not only are the materials from Result's website broader than—or unrelated to—many of the alleged trade secrets, but whether Result published them before Southeastern allegedly disclosed to Quotient the information they contain remains a disputed issue of fact.[9] And whether Result sufficiently protected the copyrighted slides marked "confidential" and "not be copied, used or disclosed," see Doc. 162-3 at 4, is also a disputed issue of fact.

Southeastern's argument concerning misappropriation damages is substantially similar to its argument concerning breach of the NDA damages and is unavailing for the same reasons.

Because a genuine dispute of material fact exists regarding misappropriation, the Court denies summary judgment as to counts II and III.

---

[9]Some of the materials on Result's website appear to have been published before the joint press release in June 2018. See Docs. 141-2, 142-1 to 142-4. When Southeastern and Quotient began discussing developing the SEG Media Hub is unclear.

### c.    Alleged Unjust Enrichment (Count VI)

Although Southeastern requests summary judgment on Result's claim for unjust enrichment, Doc. 162 at 1, 25, Southeastern fails to argue in support of the request until the reply, Doc. 165 at 7. There, in a single paragraph, Southeastern argues that the unjust enrichment claim cannot survive because the parties are bound by an NDA covering the "same subject matter." Id.

Because Southeastern fails to argue for summary judgment on the unjust enrichment claim until the reply (and even then barely addresses it), the Court considers the argument waived and thus denies summary judgment. See In re Egidi, 571 F.3d at 1163.[10]  In any event, it is a permissible alternative theory of liability.

## V.    Motions to Exclude Expert Testimony

Expert testimony is admissible if the proponent of the testimony "demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable

---

[10]Result asks the Court to deny summary judgment under Federal Rule of Civil Procedure 56(d) if the Court would otherwise rule in Southeastern's favor. Doc. 172 at 27–28. Southeastern does not reply to the request. See generally Doc. 165. Because summary judgment is denied anyway, the Court need not consider whether denial under Rule 56(d) is warranted.

principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702.

In short, expert testimony must be both reliable and relevant. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 590–92 (1993). "[D]istrict courts must engage in a rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact[.]" Rink v. Cheminova, Inc., 400 F.3d 1286, 1291–92 (11th Cir. 2005) (internal quotation marks and quoted authority omitted). "The party offering the expert has the burden of satisfying each of these three elements by a preponderance of the evidence." Id. at 1292.

The Daubert inquiry is "a flexible one." Daubert, 509 U.S. at 594. Reliability considerations may include whether a theory or technique can be and has been tested, whether the theory or technique has been subjected to peer review and publication, the known or potential rate of error, and the degree of acceptance within the relevant scientific community. Id. at 593–94; Rink, 400 F.3d at 1292. But "this list of factors . . . does not exhaust the universe of considerations that may bear on reliability." Rink, 400 F.3d at 1292 (cleaned up). "Standards of scientific reliability, such as testability and peer review, do

not apply to all forms of expert testimony." <u>Am. Gen. Life Ins. Co. v. Schoenthal Family, LLC</u>, 555 F.3d 1331, 1338 (11th Cir. 2009). "District courts have substantial discretion in deciding how to test an expert's reliability." <u>Rink</u>, 400 F.3d at 1292 (cleaned up). "A district court may decide that nonscientific expert testimony is reliable based 'upon personal knowledge or experience.'" <u>Schoenthal</u>, 555 F.3d at 1338 (quoting <u>Kumho Tire Co. v. Carmichael</u>, 526 U.S. 137, 150 (1999)).

Admissibility of an expert's testimony must not be confused with credibility: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible [expert] evidence." <u>Daubert</u>, 509 U.S. at 596. Finally, "[a]n opinion is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). "An expert witness can give his opinion about an ultimate issue so long as he does not tell the jury what result to reach." <u>United States v. Duldulao</u>, 87 F.4th 1239, 1269 (11th Cir. 2023). "There is a difference between opining on an ultimate issue and impermissibly directing the jury to a result." <u>Id.</u>

### a. *Southeastern's Motion to Exclude Testimony of Damages Expert Marc Reid*

Result retained damages expert Marc Reid to complete a lost profits analysis. Doc. 161-1 (report); Doc. 161-2 (supplemental/rebuttal report). Reid

estimated lost profits over three years between $15,122,704 and $22,797,810, which is seventy-five to one hundred percent of the projected profits Result used to pitch the media hub concept to Southeastern. Doc. 161-1 at 12. Reid also provides methods for calculating unjust enrichment damages and royalty rates, but he asserts he lacks the data to perform the calculations. Id. at 12–20.

Southeastern moves to exclude Reid's lost profits testimony on the basis that it is unreliable, specifically because Reid adopted Result's pitch projections without an independent analysis, assumed share percentages, and did not account for the advertisers' rates being speculative because they were produced before Southeastern's media channels underwent a detailed audit. See generally Doc. 161. Southeastern adds that the portion of Reid's opinion that is simple arithmetic is unhelpful to the jury. Id. at 11.

Southeastern also objects that Reid assumes a three-year contract, but during negotiations Southeastern proposed a ninety-day termination option. Id. at 12. Southeastern emphasizes that Result's other contracts have terminated and Result has no current media hub contracts or revenue. Id. at 13. Additionally, Southeastern objects to Reid's failure to address Result's use of a multiplier after completing projections for only the first year; Southeastern suggests that the various media channels make "across the board growth" improbable. Id. at 14–15.

Southeastern further argues that Reid improperly accepts Result's unexplained cost projections as reasonable and fails to analyze the costs to verify the projections. Id. at 15–16. Southeastern complains that the revenue projections include revenues Southeastern already received from business with other entities, and Result would never have received a percentage of those. Id. at 20. Finally, Southeastern argues that reference to Result's other purported media hub success in different markets and with different revenue sharing structures cannot substitute for an analysis of Result's actual projections with Southeastern. Id. at 22–24.[11]

Result responds that Southeastern relies heavily on irrelevant cases.[12] Doc. 176 at 11. Result argues that assessing lost profits using future sales projections "is well established and well accepted," and experts may rely on the projections. Id. at 2. Result describes Reid's method and assumptions and observes that Reid's analysis "differs in material respects from [Result's] forecasts (and is lower)" and he explains the differences. Id. at 2, 9–11. Result emphasizes that the standard for proving lost profits need be "adequate," not exact. Id. at 7–9. Result denies Southeastern's characterizations, defends Reid's assumptions, and contends reliance on Result's other contracts is appropriate.

---

[11]Southeastern does not challenge Reid's qualifications or the reasonable royalty calculation. See generally id.

[12]Both parties cite primarily non-binding and distinguishable cases.

<u>Id.</u> at 14–20. Result concludes that Southeastern's criticisms "are proper subject matter for cross-examination at trial or critique by opposing expert testimony."[13] <u>Id.</u> at 3.

To recover lost prospective profits, a plaintiff must prove that "there is some standard by which the amount of damages may be adequately determined." <u>W.W. Gay Mech. Contractor, Inc. v. Wharfside Two, Ltd.</u>, 545 So. 2d 1348, 1351 (Fla. 1989). "If from proximate estimates of witnesses a satisfactory conclusion can be reached, it is sufficient if there is such certainty as satisfies the mind of a prudent and impartial person." <u>Id.</u> at 1350 (quoted authority omitted). "Some standard" can include "regular market values" or "other established data." <u>Electro Servs., Inc. v. Exide Corp.</u>, 847 F.2d 1524, 1527 (11th Cir. 1988) (quoting <u>Twyman v. Roell</u>, 123 Fla. 2, 7 (Fla. 1936)).

Applying the standards for determining lost profits and the standards for permitting expert testimony, Reid's proposed testimony is not subject to <u>Daubert</u> exclusion. Contrary to Southeastern's assertions, Reid did not simply adopt Result's projected revenues, but accounted for different possibilities that could reduce them and provided a range of damages. His reliance on various assumptions is typical of experts calculating potential damages, and the law requires adequacy rather than precision. He explains his assumptions and the

---

[13] Southeastern does have a rebuttal expert to Reid. <u>See</u> Doc. 161-3 (Expert Rebuttal Report of Joshua J. Shilts).

bases of his calculations and deviations from Result's projections. The persuasiveness of those explanations is for a jury to decide. Southeastern may raise its various challenges through vigorous cross-examination—the proper "means of attacking shaky but admissible [expert] evidence." Daubert, 509 U.S. at 596.

### b. Result's Motion to Exclude Testimony of Dominique Hanssens

Southeastern retained marketing professor Dominique Hanssens to evaluate and opine on whether Result has identified the alleged trade secrets with reasonable particularity; whether the alleged trade secrets constitute information that is confidential, not generally known in the relevant field, or not readily ascertainable through proper means; and whether the evidence Result has produced establishes that Southeastern misappropriated the alleged trade secrets. See Doc. 177-2 (report); Doc. 177-3 (supplemental report). Based on his industry experience and various pieces of scholarship, he concludes that the alleged trade secrets are not in fact trade secrets and to the extent Result did have trade secrets, Southeastern did not misappropriate them. See generally Doc. 177-2. He reviewed only the Amended Complaint and documents produced by Result, not documents produced by Southeastern. Id. ¶¶ 44, 64, 70, 75; Doc. 177-3 at 35–36.

Result challenges Hanssens's methods and proposed testimony regarding misappropriation. Doc. 177 at 4–7. As to methods, Result asserts that Hanssens

fails to define "marketing industry" or give "concrete examples of any other companies in the industry offering similar products and services." Id. at 4. Result adds that Hanssens's citations are too general. Id. at 4–5. Result argues that Hanssens's opinions are not based on analysis of the facts concerning Southeastern's retail media programs and that Hanssens failed to review any documents produced by Southeastern or Quotient or interview any Southeastern employee. Id. at 5–6.

Southeastern responds that Result's challenges are generic. Doc. 146 at 5. Southeastern describes Hanssens's extensive experience and argues that because he is not a non-scientific expert, his testimony is reliable based on his knowledge and experience rather than a particular method or technical framework. Id. at 5–9. Southeastern observes that Result does not challenge Hanssens's credentials or experience. Id. at 8. Southeastern argues that Hanssens's credibility is bolstered by his citations to literature and denies that the citations are too general. Id. at 8–12.

As to misappropriation, Southeastern argues that Hanssens's opinions depend on Result's descriptions of the alleged trade secrets and on his own knowledge and discussion of what was known and available in the marketplace, not on whether Southeastern shared information with Quotient, and thus his failure to review certain documents or interview employees is immaterial. Id.

at 12–13. Southeastern adds that Result's challenges are more appropriate for cross-examination rather than exclusion. Id. at 14–15.

Result does not challenge Hanssens's credentials. Southeastern is correct that knowledge and experience can render an expert witness reliable. See Schoenthal, 555 F.3d at 1338. Because Hanssens is a non-scientific expert witness, scientific standards of reliability are inapplicable. Hanssens was not required to give "concrete examples of any other companies in the industry offering similar products and services." Result's challenges concerning lack of specificity in Hanssens's citations are more appropriately raised in cross-examination. In short, Result fails to show that Hanssens's testimony on the existence of trade secrets is unreliable to the point that it must be excluded.

Hanssens's testimony on misappropriation is also admissible. The Court disagrees with Southeastern's argument that Hanssens's misappropriation opinions are limited to whether the alleged trade secrets are in fact trade secrets—not whether Southeastern improperly disclosed them—because Hanssens states that "none of the evidence produced in this case suggests that [the alleged trade secrets] were shared between [Southeastern] and Quotient." Doc. 177-2 ¶¶ 53, 64, 70, 75; see also id. ¶ 44 (substantially similar wording). Still, his testimony is that he saw no evidence of misappropriation, not that none exists. Result remains free to challenge him on cross-examination about

30

the evidence he reviewed and argue to the jury about the significance of his limited review.

Although Hanssens's testimony is admissible, his opinions on misappropriation border on impermissibly directing the jury to a result. Southeastern must be careful not to allow Hanssens to do so. See <u>Duldulao</u>, 87 F.4th at 1269.

Accordingly, it is hereby

**ORDERED:**

1.     Result's Objection to Judge Toomey's discovery order, Doc. 164, is **OVERRULED**.

2.     Southeastern's Motion for Summary Judgment, Docs. 139, 162, is **DENIED**.

3.     Southeastern's Motion to Exclude Testimony of Damages Expert Marc Reid, Docs. 137, 161, is **DENIED**.

**4.**     Result's Motion to Exclude Testimony of Dominique Hanssens, Docs. 138, 177, is **DENIED**.

5.     The clerk is **DIRECTED** to file this Order under seal. If the parties believe any portion of the Order should be redacted or sealed, they may file a notice identifying the specific portion and explaining the need for redaction or sealing. Any such notice must be filed no later than **April 19, 2024**. If the Court receives no such notice, the Order will be entered in its entirety on the public

docket. It is the Court's strong preference that this opinion be published without redaction.

6.      By separate notice, the Court will schedule a telephone status conference to discuss further settlement efforts and set the case for trial.

**DONE AND ORDERED** in Jacksonville, Florida, the 26th day of March, 2024.



TIMOTHY J. CORRIGAN
United States District Judge

vng

Copies:

The Honorable Joel B. Toomey
United States Magistrate Judge

Counsel of record